UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEMAJ S. HOWARD,<br><br>    Plaintiff,<br><br>    v.<br><br>COUNTY OF SACRAMENTO,<br><br>    Defendant. | No. 2:16-cv-02400-JAM-DB<br><br>ORDER GRANTING SUMMARY JUDGMENT TO COUNTY OF SACRAMENTO |

Semaj S. Howard ("Plaintiff" or "Howard") sued the County of Sacramento ("Defendant" or the "County") for civil rights violations resulting from the water being shut off during his confinement at Sacramento County Jail.

The parties stipulated to dismiss individual defendants, ECF No. 13, leaving a single Monell claim against the County. The County now moves for summary judgment, Mot. Summ. J. ("MSJ"), ECF No. 15, which Howard opposes, Opp'n, ECF No. 16. For the reasons explained below, the Court grants the County's motion.[1]

---

[1] This motion was determined to be suitable for decision without oral argument. E.D. Cal. L.R. 230(g). The hearing was scheduled for March 27, 2018.

## I. FACTUAL BACKGROUND

### A. Main Jail Practices

Sacramento County Main Jail ("Main Jail") contains a Total Separation Unit on the eighth floor. The Unit is reserved for inmates that present a high security risk, such as inmates accused of notorious crimes, inmates who have demonstrated an unwillingness to follow facility rules, inmates that have been violent with others, and inmates that may be targets of violence by other inmates. Harlan Decl., ECF No. 15-3, p. 2. Inmates in the Total Separation Unit are housed in a cell alone and separated from all other inmates. Id.

Cells in the jail are equipped with a toilet and sink. Black Decl., ECF No. 15-3, p. 2. The water supplied to each cell may be shut off by valves in an exterior closet adjacent to the cell. Id. Showers are located in the dayroom, which inmates use during out-of-cell time. Harlan Decl. at 2.

While there is no written policy regarding the shut off of water in a cell, the default practice is that water remains on unless something requires it to be turned off. Id. at 3. Two issues result in a cell's water being shut off: intentional flooding and "toilet talking." Id. Intentional flooding occurs when an inmate repeatedly flushes a clogged toilet or plugs a sink and runs the water to flood the cell and housing unit. Id. Flooding generates health and safety problems because human waste may be spread throughout the housing unit. Id. "Toilet talking" is when an inmate communicates through the plumbing pipes with inmates on another floor. Id.

After flooding or "toilet talking" have ceased, running

water access is restored to the inmate's cell within a matter of hours. Id. Water is off only as long as is necessary to prevent health, safety, and security risks to the facility. Id.

**B.  Plaintiff's Incarceration**

In March 2015, Howard was detained at Sacramento County Main jail following an arrest for a probation violation and drug possession. MSJ Exs. 7-8, ECF No. 15-3, pp. 42-52. The following month, Howard moved from the Main Jail to Rio Cosumnes Correctional Center ("RCCC"). MSJ Ex. 8.

Following the addition of a murder charge against Howard, MSJ Ex. 7, the Sacramento Police Department requested that Howard be reclassified as a "total separation" inmate. MSJ Ex. 9, pp. 53-56. The police department based this request on allegations that Howard was using phone calls to threaten witnesses and trying to convince other inmates to harm witnesses in exchange for money. Id. Because RCCC lacked a total separation unit, Howard transferred back to the unit at the Main Jail in late July 2015. Id.

After several months in the Total Separation Unit, deputies turned off the running water in Howard's cell and did not turn it back on for thirteen days following an allegation that Howard had been "toilet talking." See Howard Decl., ECF No. 15-3, p. 55. While his water was turned off, Howard alleged that the deputies taunted and teased him about feces in his toilet as they walked by his cell. Id. at 69. Howard states that he was unable to file grievances about his cell water being off. Id. at 68. He did not tell medical staff that his water was off because he was afraid. Id. at 68-69, 71. Howard further alleges that he was

denied dayroom access during this period and was thus unable to shower or make phone calls. Id. at 63.

There are two accounts of how Howard's water was turned back on.[2] Howard alleges that when he told "Officer Hardy" his water was off, Hardy immediately turned it back on and asked why Howard did not say anything earlier about it. Id. at 71.

Sergeant Harlan alleges that he received a complaint from Howard's criminal defense attorney about the water being off in Howard's cell. Harlan Dep., ECF No. 15-3, p. 13. Harlan went to Howard's unit to investigate the complaint and asked the three deputies working whether Howard's water was off for eight days. Id. at 13-14. Harlan recalls the deputies looking surprised and saying that was not possible because Howard had not told them his water was off. Id. at 14. Harlan spoke to Howard through the intercom in his cell and asked if the water was on. Id. at 14-15. Howard told Harlan the water was not on. Id. The deputies then asked Howard why he did not say anything and Harlan directed them to immediately turn Howard's water back on. Id. Harlan recalls Howard saying his water was turned off for "toilet talking." Id.

Once the toilet was turned back on, it was inoperable. Howard Dep. at 71. Maintenance staff came and examined the toilet, but told Howard they would have come back after submitting a work order. Id. Rather than wait for a work order

---

[2] It is possible that the "Officer Hardy" referred to in Howard's deposition is Sergeant Harlan; however, neither party made any mention or correction of this in briefing. The Court notes this factual dispute, but does not find it to be material in the resolution of this motion.

4

to be submitted, Howard requested to clean the toilet himself with garbage bags and gloves. Id.

## II. LEGAL STANDARDS

### A. Monell Liability

Municipalities and other local government entities may be sued directly under Section 1983 when their policies or customs are the moving force behind a constitutional violation. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978). A local government entity may not, however, be held liable under a respondeat superior theory for the actions of its subordinates. Id. "In order to establish liability for governmental entities under Monell, a plaintiff must prove '(1) that the plaintiff possessed a constitutional right of which []he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.' " Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011) (quoting Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997)).

Absent a written law or express policy, Howard must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)). A plaintiff may prove the existence of

an informal policy or custom by showing "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." Gillette v. Delmore, 979 F.2d 1342, 1348-49 (9th Cir. 1992). Municipal liability "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

**B.  Pretrial Detainee Rights Under the Fourteenth Amendment**

When a pretrial detainee challenges conditions of his confinement "the proper inquiry is whether those conditions amount to punishment," because the Fourteenth Amendment prohibits punishment of detainees "prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535 (1979). To determine "whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," the court must decide whether those conditions are "imposed for the purpose of punishment or whether [they are] but an incident of some other legitimate governmental purpose." Id. at 538.

Unless detention facility officials expressed intent to punish, the determination hinges on whether the conditions are reasonably related to a legitimate government purpose, or whether the conditions appear excessive in relation to that purpose. Id. at 538-39 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)) (instructing that a court may infer an action is punitive "if it is arbitrary or purposeless"). See also Demery

v. Arpaio, 378 F.3d 1020, 1029 (9th Cir. 2004) (specifying that an action is punitive when "(1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee.").

In Bell, the Supreme Court recognized that the government "has legitimate interests that stem from its need to manage the facility in which the individual is detained." 441 U.S. at 540. Examples of those legitimate interests include the need to maintain security and order within the correctional facility and the need to ensure no weapons or drugs reach detainees. Id.

**III. ANALYSIS**

Viewing the evidence in the light most favorable to Howard and assuming that the County has a Monell-qualifying policy of shutting off the water in response to intentional flooding or "toilet talking," Howard has not presented any evidence that this policy is illegitimate, excessive, or intended to serve solely as a punishment.

First, shutting off an individual cell's running water following intentional flooding serves a legitimate governmental purpose by preventing the flow of wastewater within the cell and housing area. In the Eighth Amendment context, there is clear precedent that shutting off a cell's water to curb intentional flooding is not a constitutional violation. See, e.g., Wilson v. Timko, 972 F.2d 1348, 1992 WL 185446, at *3 (9th Cir. 1992) (unpublished) ("This temporary restriction of amenities was not cruel and unusual punishment, especially given that turning off the water related specifically to Wilson's disruptions."); Dennis

7

v. Thurman, 959 F. Supp. 1253, 1261-62 (C.D. Cal. 1997) (granting summary judgment on Eighth Amendment claim for 36-hour denial of water because use of water to flood the cell block was a "legitimate" reason to temporarily turn off water). That is because shutting off water in response to intentional flooding is not so completely without justification that it results in gratuitous suffering. See Wilson, 972 F.2d 1348, at *3 (noting that when an inmate was already in administrative segregation, "there was no alternative sanction to encourage disciplined behavior"). Cell block flooding creates "a dangerous condition for both prison officials and other inmates," Dennis, 959 F. Supp. at 1262, and it is permissible for the County to temporarily deny sanitation in order to rectify the situation.

Second, shutting off running water to prevent "toilet talking" serves a legitimate governmental interest in preventing individuals in the Total Separation Unit from inter-cell communication. The parties agree that "toilet talking" enables an inmate to communicate with other inmates. Accordingly, where an inmate is in the Total Separation Unit to prevent communication with others, allowing the continuance of "toilet talking" would hinder the efficacy of the inmate's separation. If temporarily suspending running water disables the ability to "toilet talk," then it is reasonably related to the County's legitimate interest in preventing communication that endangers facility security.

Thus, the goal of shutting off the water under these two circumstances is neither arbitrary nor purposeless. The temporary suspension of running water after flooding or "toilet

8

talking" serves the legitimate goal of maintaining safety, security, and order within the jail.  Furthermore, Howard has not presented any evidence—other than his isolated experience—that disproves the County's assertion that running water is restored soon after flooding or "toilet talking" have ceased.  Viewing the evidence in the light most favorable to Howard, he has failed to show that the County had a policy or practice of violating detainees' constitutional rights.

## IV.  CONCLUSION

For the above reasons, the County's Motion for Summary Judgment is GRANTED.

Dated:  March 28, 2018.

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE